# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4157 | **DATE** | 7/2/2001 |
| **CASE TITLE** | Odella Cook vs. Larry G. Massanari | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. This case is remanded to the ALJ pursuant to the fourth sentence of 42 U.S.C. 405(g). On remand, the ALJ should conduct an analysis consistent with this decision and the regulations and social security rulings cited herein.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | **2** number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 0 5 2001 date docketed | |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | CM docketing deputy initials | |
| | Copy to judge/magistrate judge. | 7/3/2001 date mailed notice | |
| IS | courtroom deputy's initials | | |

EO-7
FILED FOR DOCKETING
01 JUL -3 AM 9: 49

Date/time received in central Clerk's Office

IS
mailing deputy initials

Document Number
14

DOCKETED

JUL 0 5 2001

| | | |
|---|---|---|
| **ODELLA COOK,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 00 C 4157 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **LARRY G. MASSANARI,** Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Odella Cook, seeks judicial review of the final decision of the Commissioner of

Social Security (the "Commissioner") denying Cook Supplemental Security Income ("SSI"). In

toto, Cook presents six challenges to the decision. Cook argues that the Administrative Law

Judge (the "ALJ") erred by (1) failing to evaluate nonmedical evidence, (2) failing to consider the

combined effects of Cook's impairments, (3) failing to develop the record by ordering a

consultative medical examination, and (4) failing to discuss contrary evidence. Cook also

contends that substantial evidence did not support the ALJ's findings that (1) Cook's incontinence

was not a severe impairment and (2) that Cook's heart condition could not cause her anginal pain

and fatigue. For the following reasons, we remand the decision of the ALJ.[2]

---

[1] On March 29, 2001, Larry G. Massanari became Acting Commissioner of Social Security. In accordance with Federal Rule of Civil Procedure 25(d)(1) and 42 U.S.C. §§ 405(g) and 1383(c)(3), Larry G. Massanari is automatically substituted for Kenneth S. Apfel as the Defendant in this action.

[2] All parties have consented to have this Court conduct any and all proceedings, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b).

## I.  Procedural Background

This case originated on December 21, 1983, when Cook applied for Disability Insurance Benefits ("DIB") and SSI with a protective filing date of October 30, 1983.  Both of the claims were denied.  Cook did not appeal the denial of DIB, but on April 30, 1993, she filed a request for review of the SSI claim under *Johnson v. Sullivan*, 922 F.2d 346 (7th Cir. 1990) (finding that social security regulations barring consideration of the combined effects of impairments were arbitrary and capricious).  The Illinois Disability Determination Services found that Cook was a member of the *Johnson* class; however, her SSI claim was again denied on August 24, 1995.  Cook then requested a hearing before an ALJ.

Prior to the hearing, Cook was awarded divorced spouse benefits effective August 1995.  The amount of those benefits was greater than the SSI payment amount, thereby making Cook ineligible for SSI from that point forward.  Also prior to the hearing, Cook amended the onset date of her impairments in the pending SSI case.  It was changed from October 30, 1983, to February 11, 1986.  Hence, the relevant time period before the ALJ was between February 11, 1986, and July 31, 1995 -- the day prior to Cook receiving divorced spouse benefits.  (*See* Record at 16.)

The hearing before the ALJ was held on November 3, 1999.  The ALJ elicited testimony from Cook, who was represented by counsel; two of Cook's friends, Judy Ann Chessier and Resojana Chessier; and Dr. Lawrence Perlman, a medical expert.  In light of this and other evidence, the ALJ concluded that Cook did not have a severe impairment during the relevant time period, and therefore was not entitled to SSI.

Cook requested review of the ALJ's decision by the Appeals Council, but that request was denied on May 9, 2000. At that point, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Cook now seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

## II.    Factual Background

### A.    Cook's Testimony

Cook was born on February 11, 1931. During the relevant time period she was between fifty-five and sixty-four years old, while at the time of the hearing she was sixty-eight years old. Cook attended school through the eighth grade; she was divorced and the mother of eight children; she lived at several different locations from February 11, 1986, to July 31, 1995, including shelters and the homes of friends.

Cook claimed to have two impairments, anginal pain and fecal incontinence. The anginal pain was often brought on by physical exertion and had bothered Cook for over thirty-five years. It affected her chest and the left side of her body from her shoulder down through her left arm.

During the 1980s and 1990s, Cook experienced anginal pain about twice a month, sometimes for as long as three days. Cook described the chest pain as like "a charley horse in the chest." (Record at 366.) On a scale from one to ten, Cook said the pain was a ten -- like childbirth. Cook often went to hospital emergency rooms when the pain became unbearable. At times physicians prescribed medicine such as nitroglycerine for her pain, but often Cook did not take medicine either because she could not afford it or because it caused adverse side effects.

Cook's second health problem was fecal incontinence, which had also bothered her for over thirty-five years. A doctor had once told Cook that the incontinence was caused by an anal fissure.

At one point the incontinence forced Cook to use the bathroom, on average, five times each day before noon. Cook tried using pads, sprays, and adult diapers to manage the incontinence, but the products proved ineffective; furthermore, Cook could not always afford them. She also tried changing her diet, but that did not help matters much.

In the early 1990s, Cook began taking Imodium to control her incontinence. If Cook took two doses of Imodium, her bowels would not leak for about three days.

Cook's work experience was sporadic and insignificant. Between 1983 and 1995, Cook claimed that chest pain and incontinence impaired her ability to find long-term work. She did, however, find seasonal work selling products and straightening up merchandise on the shelves at Marshall Field's and Lord and Taylor. Even though these were seasonal positions, Cook initially said that she was let go because of chest pain and incontinence -- the impairments caused Cook to stay home and miss work. Later, Cook testified that Marshall Field's offered her permanent employment but that she was fired or declined the offer because of chest pain and incontinence.

Cook suspected that chest pain and incontinence also caused her to lose her position as a counselor at a community center in 1990 because she missed too many meetings over six months. Cook recalled holding a position as a hotel maid. Again Cook testified that chest pain and incontinence caused her to miss work; she was fired after three weeks.

In addition to limiting her ability to work, Cook's impairments also impacted other aspects of her life. Daily activities were constrained primarily to the indoors: reading, watching

- 4 -

television, and periodically babysitting and doing light household chores. She would not visit friends but on occasion friends would visit her. Frequently Cook had people shop and cook for her; sometimes people groomed and cleaned her.

### B. Testimony of Judy Ann and Resojana Chessier

Cook lived with Judy Ann in the early 1980s; at the time of the hearing Judy Ann had known Cook for about twenty-eight years and considered Cook a very good friend. Judy Ann had knowledge of both of Cook's impairments: she cleaned Cook's body and clothes when Cook experienced incontinence and she took Cook to the hospital on several occasions due to chest pain. Sometimes Judy Ann would take Cook to run errands if Cook could afford to buy adult diapers.

Resojana, Judy Ann's daughter, also testified at the request of Cook. Resojana met Cook through Judy Ann; Cook lived with Resojana in 1991 and 1992. During the time Cook lived with Resojana, Resojana found Cook to be "sickly." (*Id.* at 389.) Resojana recalled that Cook could not control her bowels and remembered taking Cook to the hospital three or four times for chest pain. Before taking Cook to the hospital, Resojana would try to ease the pain by giving Cook medicine or a massage.

Chest pain prohibited Cook from helping Resojana with household chores. On a typical day, Cook would sit in a room and watch television. Over time Cook became depressed and verbally abusive. When asked about the time she lived with Cook and Judy Ann in Chicago, Resojana's testimony corroborated Judy Ann's.

## C.    Medical Evidence

The record contains several medical reports dealing with Cook's complaints of anginal pain.[3] By way of introduction, anginal pain is pain caused by angina pectoris ("angina"). Angina is defined as "a paroxysmal thoracic pain . . . most often due to ischemia of the myocardium." Dorland's Illustrated Medical Dictionary 81 (29th ed. 2000). Stripped of medical jargon, this means that angina is chest pain due to lack of blood flow to the heart.

The first medical examination on record occurred in February 1984. Cook's heart was found to be normal. At the time, Cook was at a hospital seeking treatment for a fractured fibula. After being fitted with a boot cast and crutches, Cook returned home for convalescence.

The next medical report is from years later. On March 25, 1992, Cook went to the emergency room at Louis A. Weiss Memorial Hospital complaining of chest pain. The physician discharged Cook with instructions to rest and return to the emergency room if chest pain persisted. Though several tests appear to have been performed, no diagnosis was noted.

Nearly two years later Cook called "911" because of persistent chest pain. While en route to the emergency room at the University of Minnesota Hospital and Clinic ("UMHC"), paramedics gave Cook nitroglycerine to ease the pain. At the hospital, Dr. Naip Tuna's physical examination of Cook was normal except for an apical pansystolic murmur suggesting mitral regurgitation. Cook's serial electrocardiograms, cardiac enzymes, and chest x-rays were normal, and therefore myocardial infarction was ruled out. Dr. Tuna's impression was that the chest pain

_____

[3] At the outset, we note that much of the medical evidence in this case is dated after July 31, 1995 -- outside the relevant time period. Apparently Cook's social security file that included medical records from the 1980s was lost. Efforts to locate these records from other sources were unsuccessful. (*See* Record at 263, 321.)

was noncardiac in origin and of unknown etiology. Cook was discharged in good condition the next day with instructions to schedule an electrocardiogram and stress test. Dr. Tuna prescribed aspirin, nitroglycerine, and Tylenol as needed.

On April 10, 1994, Cook sought treatment for chest pain at an emergency room in Chicago. A physician prescribed a nitroglycerin patch and Ismo. Cook did not use any Ismo and quit using the nitroglycerine patch because it made her dizzy. The chest pain subsided.

On April 26, 1994, Cook returned to UMHC for testing. The electrocardiogram revealed mild to moderate mitral stenosis, mild to moderate mitral regurgitation, moderate tricuspid regurgitation, trace aortic insufficiency, mild increase in right ventricular systolic pressure, and mild bi-atrial enlargement. The stress test lasted 7.9 minutes, reaching a peak heart rate of 122 and peak blood pressure of 150/70. The test ended when Cook became dizzy and experienced thigh pain. Cook experienced no chest pain, and she developed no significant ST-T changes. The resting electrocardiogram was normal, and the exercise stress test was negative for ischemia. Dr. Tuna noted that Cook's exercise capacity was markedly reduced. In conclusion, Dr. Tuna opined that Cook had rheumatic heart disease with mitral stenosis and mitral regurgitation, mild pulmonary hypertension, and moderate tricuspid regurgitation, but no evidence of congestive heart failure. Dr. Tuna recommended a low sodium diet; prescribed Metoprolol, a beta blocker; and suggested scheduling an appointment in two months.

On May 26, 1995, Cook was admitted to North Memorial Medical Center in Minnesota complaining of chest pain. After receiving nitroglycerine, the pain subsided. An electrocardiogram was normal except for bradycardia -- i.e., slow heartbeat -- and Dr. Kurt

Partoll ruled out myocardial infarction. Dr. Partoll restarted Cook on her beta blocker and told Cook to contact her physician and schedule another stress test.

Approximately six months later, Cook arrived at Hennepin County Medical Center in Minnesota, again complaining of chest pain. Myocardial infarction was ruled out with enzymes; physicians administered aspirin rectally. A stress echo revealed normal left ejection fraction. The screening echo prior to the stress echo showed normal left ventricular ejection fraction, mild aortic valve insufficiency, mild mitral valve insufficiency, moderate rheumatic mitral stenosis, bi-atrial enlargement, and moderately severe tricuspid insufficiency. A cardiac catheterization revealed normal coronary arteries, no significant mitral stenosis, and mild mitral insufficiency. A pulmonary function report diagnosed episodic dyspnea. Physicians prescribed a calcium channel blocker and told Cook to follow a regular diet and to contact a cardiologist to schedule an appointment. No restrictions were placed on Cook's physical activity.

A November 17, 1998 trip to the University of Chicago Hospitals's emergency room for chest pain serves as the final piece of medical evidence on Cook's anginal pain. While at the hospital, Cook's physical examination was insignificant. A cardiac catheterization showed a normal left ventricular ejection fragment and no significant coronary artery disease was found. Dr. Jeffrey Zigman's diagnosis was unstable angina.

There are also some medical records scattered between February 1994 and July 1997 relating to Cook's complaints of incontinence. On February 25, 1994, Cook was seen at Chicago University Hospital complaining of abdominal and rectal pain; she was prescribed an ointment. On January 25, 1995, a physician at UMHC's colon-rectal clinic examined Cook to determine the cause of Cook's stool leakage, which occurred after bowel movements. (Cook made no

complaint of pain or bleeding.)  The examination found "good tone and squeeze anteriorly."
(Record at 133.)  The physician diagnosed Cook with mild fecal incontinence.

Dr. Alfred Clavel noted the possibility of an anal fissure on December 3, 1995, likely due
to birth injury.  On July 31, 1997, Dr. Eli Ehrenpreis found a lack of external anal sphincter tone,
perhaps caused by multiple child births.  Dr. Ehrenpreis instructed Cook to take Consul tablets
and Imodium, and raised the possibility of discussing surgery.

### D.      Medical Expert

Dr. Perlman testified last at the ALJ hearing.  He had previously reviewed the medical
evidence and was present during the testimony of Cook, Judy Ann, and Resojana.  Based on that
information, Dr. Perlman concluded that Cook did not suffer from a severe impairment.  (*See id.*
at 398.)

In terms of anginal pain, Dr. Perlman first noted the absence of any physical basis.  He
pointed to the two cardiac catheterizations, which revealed normal coronary arteries and good
ejection fractions.  Even though certain tests were performed outside the relevant time period, if
there were a coronary artery problem within that period, Dr. Perlman opined that it would have
appeared when the tests were taken.  Perhaps, Dr. Perlman speculated, the chest pain was caused
by something else, for example, a coronary artery spasm.  Finally, Dr. Perlman ruled out Cook's
mitral stenosis, mitral insignificance, and aortic insignificance as the cause of Cook's pain and
fatigue based on the results of the cardiac catheterizations.  In sum, Dr. Perlman agreed that
Cook's pain seemed incapacitating, but, in the absence of any physical basis, it could not be
considered an impairment.

Turning to the issue of incontinence, Dr. Perlman again noted the absence of any physical basis. (*See id.* at 395.) He recalled that a physician attributed the incontinence to an anal fissure, but Dr. Perlman disagreed with the conclusion because Cook never experienced rectal pain. (*See id.* at 396.) Instead, Dr. Perlman suggested that the incontinence was caused by debilitation of the rectal sphincter (due to Cook's multiple childbirths) and poor bowel habits. Despite this and the social problems that the incontinence produced, Dr. Perlman found that the incontinence did not impact Cook's functional capacity.

When asked what level of exertion Cook could have performed during the relevant time period, Dr. Perlman stated, "I certainly think that [Cook] could [have] perform[ed] on a light basis, for sure." (*Id.* at 398.) When asked by Cook's attorney to opine on the likelihood that Cook's heart abnormalities could cause Cook's symptoms of pain and fatigue, Dr. Perlman answered that it would be unlikely. (*See id.* at 400.) Cook's attorney's final question -- Was there anything that could possibly cause Cook's symptoms? -- resulted in Dr. Perlman repeating his earlier guess, coronary artery spasm. (*See id.*)

### E.    The ALJ's Decision

In light of the above, the ALJ concluded that Cook did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities.[4] Similarly stated, Cook did not have a severe impairment and therefore was not disabled. The analysis ended at step two. *See infra* p.13 n.5.

---

[4] The impairments that the ALJ considered, as listed in the findings section of the decision, include "anginal pain" and "fecal incontinence." (*Id.* at 18.)

In her decision, the ALJ briefly reviewed the medical evidence of Cook's anginal pain:

> An echocardiogram from April of 1994 revealed mild to moderate mitral stenosis, mild to moderate mitral regurgitation, moderate tricuspid regurgitation, trace aortic insufficiency, a mild increase in right ventricular systolic pressure, and mild bi-atrial enlargement. An exercise stress test was negative for ischemia. There was no evidence of congestive heart failure. After July of 1995, the claimant underwent two cardiac catheterizations. Both were normal and revealed good ejection fractions.

(Record at 17.) The ALJ then cited Dr. Perlman's testimony, agreeing that the medical evidence suggested that Cook did not have coronary heart disease during the relevant time period. Finally, the ALJ narrated Dr. Perlman's testimony that Cook's aortic insufficiency and mitral stenosis could not cause the type of pain Cook complained of.

The ALJ based her conclusion that Cook's incontinence was not a severe impairment on Dr. Perlman's testimony, Cook's failure to raise the problem when treated for chest pain, and the January 1995 medical report, in which Cook's incontinence was described as mild in nature. Lastly, the ALJ pointed out that Cook never complained of rectal pain.

In the second to last paragraph of the decision, the ALJ considered Cook's testimony along with that of Judy Ann and Resojana, but found the testimony unpersuasive in light of the medical evidence, citing 20 C.F.R. § 416.908. Four brief findings followed.

## III. Discussion

The scope of judicial review in federal benefits cases is limited. With regard to the ALJ's factual findings, the reviewing court cannot reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *See Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir.

1993); *O'Connor v. Sullivan*, 938 F.2d 70, 73 (7th Cir. 1991) ("We have no authority to supply a ground for the agency's decision."); *see also SEC v. Chenery, Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Instead, the court only tests whether the ALJ's decision is supported by substantial evidence in the record. If it is, the decision must be affirmed. *See Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y., Inc. v. NLRB*, 305 U.S. 197, 229 (1938)). In other words, the ALJ's findings must be supported by more than a mere scintilla of the evidence, but they may be supported by less than the greater weight of the evidence. *See id.*; *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Of course the ALJ's application of legal principles is also subject to review. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir. 1998); *Smith v. Bowen*, 792 F.2d 1547, 1549 (11th Cir. 1986). In this regard, review is plenary, not limited by the contours of substantial evidence. *See White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999); *Lewis v. Apfel*, No. Civ.A. 99-0330-CB-G, 2000 WL 207018, at *3 (S.D. Ala. Feb. 16, 2000). The court must be satisfied that the ALJ's application of law is properly grounded.

## A.    Step-Two Analysis

At step two of the five-step sequential analysis the ALJ must determine whether a claimant's impairment or combination of impairments is severe.[5] This includes an initial finding of whether the claimant has a medically determinable impairment, which is an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908. Otherwise stated, the ALJ must initially find that the claimant has an "objectively verifiable abnormality."

---

[5] The five-step sequential analysis used by the ALJ to determine whether a claimant is disabled goes as follows:

| | |
|---|---|
| Step one: | Is the claimant presently employed? If so, the claimant is not disabled; if not, the inquiry proceeds to step two. |
| Step two: | Is the claimant's impairment severe and expected to last at least twelve months? If not, the claimant is not disabled; if so, the inquiry proceeds to step three. |
| Step three: | Does the impairment meet or exceed one of a list of specific impairments? If so, the claimant is disabled; if not, the inquiry proceeds to step four. |
| Step four: | Is the claimant able to perform her past relevant work? If so, the claimant is not disabled; if not, the inquiry proceeds to step five where the burden shifts to the ALJ. |
| Step five: | Is the claimant able to perform any other work within her residual functional capacity in the national economy? If so, the claimant is not disabled; if not, the claimant is disabled. |

*See* 20 C.F.R. § 416.920.

*Sparks v. Bowen*, 807 F.2d 616, 618 (7th Cir. 1986) ("No claim may be allowed without medical

evidence showing that the complaint [of pain or fatigue] has an ascertainable cause.").

Accordingly, a symptom[6] is not a medically determinable impairment:

> No symptom or combination of symptoms by itself can constitute a
> medically determinable impairment. In claims in which there are no
> medical signs or laboratory findings to substantiate the existence of
> a medically determinable physical . . . impairment, the individual
> must be found not disabled at step 2 of the sequential evaluation
> process . . . .

SSR 96-4p. This holds no matter how genuine the symptom may appear to be. *See*

*Moothart v. Bowen*, 934 F.2d 114, 116 & n.1 (7th Cir. 1991).

Only after the initial finding of an objectively verifiable abnormality is made, does the ALJ

begin looking at the claimant's symptoms such as pain or fatigue. *See Sparks*, 807 F.2d at 618.

This principle is well recognized. *See* SSR 96-7p; SSR 96-4p; SSR 96-3p.

Even at this stage a claimant's symptoms may be properly ignored by the ALJ if the ALJ

makes a finding, based on substantial evidence, that the objectively verifiable abnormality could

not reasonably be expected to produce the claimant's pain or other symptoms. *See Moothart*, 934

F.2d at 116 (quoting 20 C.F.R. § 404.1529(a)); SSR 96-7p. Conversely, if the ALJ makes a

finding that the objectively verifiable abnormality could reasonably be expected to produce the

claimant's symptoms, then, and only then, is the ALJ required to consider and evaluate "the

intensity, persistence, and functionally limiting effects of the [claimant's] symptoms." SSR 96-7p;

*see also* 20 C.F.R. § 416.929.

---

[6] A symptom is "an individual's own description of his or her physical or mental
impairment(s)." SSR 96-7p.

The ALJ's evaluation of the severity of the symptoms does not take place in a vacuum. Indeed, when evaluating the claimant's symptoms, the ALJ must also consider the objective medical evidence and other evidence to determine whether an impairment or combination of impairments is severe. *See* SSR 96-3p. But as SSR 96-7p warns: symptoms can suggest a greater severity than objective medical evidence alone and different individuals experience their symptoms differently; therefore, the ALJ must carefully consider the claimant's symptoms. Most important, this means that once the ALJ finds that the claimant's objectively verifiable abnormality could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ is required to make a credibility finding about the claimant's statements regarding her symptoms and their functional effects. *See* SSR 96-7p. Substantial evidence dictates the appropriate findings. *See Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1983); *Thompson v. Sullivan*, 741 F. Supp. 1297, 1300 (N.D. Ill. 1990).

Against this backdrop, we analyze the ALJ's decision at step two.

### B.    Cook's Anginal Pain

In the narrative portion of the ALJ's decision, the ALJ first stated the conclusion that Cook's anginal pain did not constitute a severe impairment. Next, the ALJ summarized the lengthy medical record: the brief hospitalizations due to chest pain revealed minimal findings; the April 1994 echocardiogram showed mild to moderate mitral stenosis, mild to moderate mitral regurgitation, etc.; the stress test was negative for ischemia; no evidence showed congestive heart failure; and the two cardiac catheterizations were normal and revealed good ejection fractions. (*See* Record at 17.)

The ALJ then narrated the testimony of Dr. Perlman: the evidence did not suggest coronary artery disease; neither Cook's aortic insufficiency nor Cook's mitral stenosis could cause the type of pain Cook experienced; there was no cardiac basis for Cook's complaint of pain or fatigue. (*See id.*) Finally, the ALJ considered the testimony of Cook, Judy Ann, and Resojana. All of this preceded the findings that (1) Cook had the medically determinable impairment of anginal pain and (2) that Cook's anginal pain did not constitute a severe impairment.

Confining our review solely to the paragraph of the decision where the ALJ discussed the medical evidence relating to Cook's anginal pain, it would appear that the ALJ found no objectively verifiable abnormality. If that were the case, we do not understand why the ALJ later considered the testimony of Cook and her friends[7] and cited 20 C.F.R. § 416.908 for the proposition that an impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."[8] (*See* Record at 18.)

The fact that the ALJ considered the testimony of Cook and her friends and cited 20 C.F.R. § 416.908 for the above-mentioned proposition, suggests that the ALJ inquired into the intensity, persistence, or functionally limiting effects of Cook's symptoms. Contrary to the thrust of the decision, this would mean that the ALJ found that Cook had

---

[7] *See supra* Section III(A).

[8] Instead the ALJ should have cited 20 C.F.R § 416.908 for its language that an impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."

an objectively verifiable abnormality that could cause her symptoms. If that were so, credibility findings should have been made. *See supra* p. 15.

The ALJ's decision suffers from an even greater case of ambiguity than this. The ALJ's second finding lists anginal pain as one of Cook's medically determinable impairments. (*See* Record at 18.) But pain is a symptom not a medically determinable impairment. *See* SSR 96-4p. Does this mean that Cook had no medically determinable impairment? Some other medically determinable impairment? Or some other medically determinable impairment that could reasonably cause Cook's anginal pain?[9]

As Cook correctly points out, our discussion of Cook's chest pain must end here. (*See* Pl.'s Reply Br. at 2 ("When it reviews an ALJ's decision, a court evaluates the reasons the ALJ gave for his decision, not post hoc rationalizations for the decision.").) It is essential that in cases where the ALJ denies benefits, the ALJ "'build[s] an accurate and logical bridge from the evidence to [her] conclusion'" for meaningful appellate review. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Here the ALJ has not built an accurate and logical bridge from the evidence to her conclusion (but rather has left an irreconcilable divide between the two). On remand, the ALJ should reconsider and clarify her decision according to the regulations and social security rulings set forth in the section above.

---

[9] Cook recognized this ambiguity. Rather than confront it in her initial brief, Cook substituted mitral stenosis for anginal pain as the medically determinable impairment. (*See* Pl.'s Mot. Summ. J. at 13-14.) It was in the reply brief that Cook touched on the ambiguity, arguing that anginal pain could reasonably cause chest pain. (*See* Pl.'s Reply Br. at 2.)

## C.    Cook's Fecal Incontinence

The ALJ's decision on Cook's other alleged impairment -- fecal incontinence -- is marked

with similar ambiguity.  This Court cannot determine the path of the ALJ's decision.

The ALJ begins her discussion of Cook's incontinence like the discussion of anginal pain,

by stating that Cook's incontinence was not a severe impairment.  Likewise, all of the ALJ's

comments in her narrative section minimize Cook's incontinence during the relevant time period:

Dr. Perlman concluded that Cook's incontinence was more of a social problem; Cook did not even

mention her incontinence on several occasions when she was treated for chest pain; in January

1995 a physician described Cook's incontinence as mild in nature; and Cook admitted that her

incontinence did not cause any pain.  (*See* Record at 17.)  Again the ALJ stated that she

considered the testimony of Cook and her friends.

One of the ALJ's findings declared that Cook's fecal incontinence was a medically

determinable impairment; while another declared that the impairment was not severe.  (*See id.* at

18.)

We are faced with a quandary like that in Section III(B).  First, it is unclear whether an

objectively verifiable abnormality exists.  Assuming the ALJ found that incontinence was an

objectively verifiable abnormality -- and as strange as this may sound -- assuming that this

abnormality could have reasonably caused Cook's incontinence,[10] *see Crowley v. Apfel*, 197 F.3d

194, 198-99 (5th Cir. 1999), and considering the fact that the ALJ looked at Cook's and her

---

[10]  A January 1995 report stated that Cook's incontinence could have been caused by birth
injury.  (*See id.* at 133.)  In December 1995, Dr. Clavel suspected that Cook's incontinence was
caused by an anal fissure.  (*See id.* at 178.)  And in July 1997 Dr. Ehrenpreis concluded that
Cook's incontinence was caused by damage to her anal sphincter.  (*See id.* at 300.)

friends' testimony as to the severity of Cook's incontinence, then the ALJ erred by not making the proper credibility findings. "It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' . . . ." SSR 96-7p. That is what the ALJ did in this case. (*See* Record at 18 ("In reaching this conclusion, the undersigned has considered the testimony of the claimant and her two friends.").)

As it turns out, this section is long on assumptions, which illustrates the ambiguities as to what evidence the ALJ evaluated and how she evaluated it. On remand, the ALJ should reconsider and clarify this part of her decision according to the regulations and social security rulings set forth in Section III(A).


### D.    Coronary Artery Spasm

Cook also claims that the ALJ failed to develop the record by not ordering a consultative medical examination to test Cook for the presence of coronary artery spasm. This argument arises out of Dr. Perlman's testimony that a coronary artery spasm could be the cause of Cook's chest pain. (*See id.* at 396, 400.) Dr. Perlman seemed to suggest that, if physicians "try to provoke the currents," a cardiac catheterization would reveal whether Cook suffered from coronary artery spasm during the relevant time period. (*Id.* at 396.)

In his response, the Commissioner pointed out that an ALJ cannot order a claimant to undergo a cardiac catheterization because of the significant risks associated with the procedure. *See* 20 C.F.R. § 416.919m. Because Cook did not counter this argument in her reply, we assume that coronary artery spasm can only be detected with a cardiac catheterization, and therefore Cook's argument on this ground is without merit.

### E.    Dr. Perlman's Light Work Limitation

Lastly, Cook argues that the ALJ failed to consider important contrary evidence by not discussing Dr. Perlman's assessment that Cook was limited to light work.  The Commissioner accuses Cook of taking this statement out of context, ignoring the great weight of Dr. Perlman's testimony.

The ALJ has a duty to discuss relevant evidence contrary to her decision.  *See Binion v. Chater*, 108 F.3d 780, 788-89 (7th Cir. 1997).  This duty applies irrespective of the amount of objective medical evidence supporting the medical expert's or physician's opinion, an opinion based on very little objective evidence will do.  *See Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir. 1994) (involving a medical expert's opinion that the claimant was limited to light work).  Because the ALJ did not adequately articulate the bases for her findings, this Court cannot properly evaluate the relevance of Dr. Perlman's statement or whether it was contrary to the ALJ's decision.  On remand, to the extent that the ALJ makes determinations as to the severity of Cook's impairments, the ALJ should discuss Dr. Perlman's statement that Cook "could [have] perform[ed] on a light basis, for sure," assuming the statement is relevant and contrary to the ALJ's decision.

## IV. Conclusion

For the reasons stated, this case is remanded to the ALJ pursuant to the fourth sentence of 42 U.S.C. § 405(g). *See* 42 U.S.C. § 1383(c)(3). On remand, the ALJ should conduct an analysis consistent with this decision and the regulations and social security rulings cited herein.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** July 2, 2001.

Copies have been mailed to:

| | |
|---|---|
| EDWARD KRAUS, Esq.<br>Chicago-Kent College of Law<br>Illinois Institute of Technology<br>565 West Adams Street<br>Suite 600<br>Chicago, IL 60661-3691 | CAROLE J. RYCZEK, Esq.<br>Assistant U.S. Attorney<br>219 South Dearborn Street<br>Suite 500<br>Chicago, IL 60604 |
| Attorney for Plaintiff | Attorneys for Defendant |